UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Mark R. Hurlbut,  )
    Plaintiff,  )
v.  ) No. 15 CV 50270
 ) Magistrate Judge Iain D. Johnston
Carolyn W. Colvin, Acting  )
Commissioner of Social Security,  )
    Defendant.  )

## MEMORANDUM OPINION AND ORDER

This is an action challenging the administrative law judge's ("ALJ") denial of social security disability benefits to plaintiff Mark R. Hurlbut. *See* 42 U.S.C. §405(g). Plaintiff alleges that he suffers from long-standing back pain. The ALJ agreed that plaintiff's multilevel degenerative disc disease was causing him pain, even severe pain at times, but concluded that plaintiff could still work a full-time sedentary job. In reaching this decision, the ALJ rejected the opinions of two treating doctors. As explained below, the Court finds that a remand is required to address several unresolved medical questions.

## BACKGROUND

The ALJ's opinion contains a lengthy summary of plaintiff's treatment history beginning in 2004. Over this period, plaintiff was treated by many doctors and tried many treatments to alleviate his back-related pain. These included fusion surgery in 2004 performed by neurosurgeon Dr. Diane Sierens. After this surgery, plaintiff was treated by Dr. Fred Sweet, an orthopedist and spinal surgeon. Eventually, plaintiff was sent to a pain management doctor, Dr. A.P. Rosche of Advanced Pain Intervention, who treated plaintiff from 2006 through August

1

2011 and who tried various treatments and numerous medications to alleviate the pain. In 2013, plaintiff began seeing a new pain specialist, Dr. Ishmeet Singh, who completed a questionnaire about plaintiff's condition. This questionnaire is one of the two opinions from a treating physician. The other one is a one-page letter, dated March 29, 2012, from Dr. John T. Dorsey, plaintiff's longtime primary care physician.

On November 21, 2013, a hearing was held before the ALJ. Plaintiff's counsel gave an opening statement, explaining that plaintiff was then taking Methadone four times a day, a drug which counsel described as "an extremely strong opiate narcotic medication for pain." R. 50. Counsel also explained that, although plaintiff could perform certain activities from time to time that were consistent with a sedentary job, he could not perform them on a sustained basis because his condition fluctuated with good and bad days. Plaintiff testified that he was 49 years old and lived with his wife. He last worked in December 2010, as a restaurant manager, and quit because he was having sharp stabbing pains between his shoulder blades, which radiated down his back. He had problems standing on his feet and walking and lifting things, and his problems had worsened in the last year and half.

On June 25, 2014, the ALJ found that plaintiff was not disabled in a lengthy opinion (19 pages). The ALJ found that plaintiff had the severe impairments of "degenerative disc disease of the cervical, thoracic and lumbar spine and osteoarthritis of the bilateral knees"; that plaintiff's depression did not qualify as a severe impairment; and that plaintiff did not meet a listing. The ALJ found that plaintiff could do a reduced range of sedentary work.

## DISCUSSION

Plaintiff raises the following two related arguments for remand: (1) the ALJ failed to follow the treating physician rule; and (2) the ALJ "played doctor" by engaging in a layperson

analysis of the medical evidence. In a sense, the first argument could be viewed as an example of the general principle underlying the second argument. The Court therefore will begin with the latter argument. Both arguments rest on the fact that the ALJ did not rely on any medical expert.

I.      **Playing Doctor**

Plaintiff argues that the ALJ played doctor in multiple instances throughout the opinion. This Court agrees that the ALJ made medical judgments beyond his expertise or at least failed to provide a sufficient explanation to enable the Court to follow his reasoning.

**Conservative Treatment.** One of the ALJ's rationales for finding plaintiff not disabled was that his medical treatment was supposedly conservative. The ALJ, however, did not provide a clear explanation for this conclusion. Plaintiff was treated by numerous doctors (including three pain management specialists over a nine-year period), had many tests such as MRIs, and tried various treatments including epidurals and pain medication. After reading this ALJ's own summary of this treatment history, the Court did not understand why these treatments should be viewed as conservative. This uncertainty leads to a broader question: which treatments are considered to be conservative for a person with plaintiff's particular conditions and his specific treatment history? The ALJ did not answer this question or otherwise cite to any authority for the claim that plaintiff's treatment was conservative. The supposedly conservative nature of the treatment is not self-evident to this Court, and the question requires medical expertise to answer. For example, as plaintiff noted in his opening brief, when his orthopedist (Dr. Sweet) referred him to a pain medication specialist (Dr. Rosche) in 2006, the orthopedist noted that plaintiff had *already* by that time tried "multiple conservative treatment modalities" which provided no relief. Dkt. #12 at 4. This is strong medical evidence that subsequent treatments were *not* conservative.[1]

---

[1] Neither side has cited to any case law or regulations explaining which treatments are conservative for this type of back pain. Some authorities view epidurals as aggressive treatments, although this Court has not fully researched

3

Even if the analysis were limited to plaintiff's present treatment of taking methadone four times a day, there is still a question of whether even this is conservative, as the ALJ seems to be claiming. As noted above, at the hearing, plaintiff's counsel described methadone as "an extremely strong opiate narcotic medication." And neither the ALJ nor the government provides any evidence to the contrary. In sum, there is no statement from any doctor indicating that this treatment was conservative. On remand, the ALJ must call a medical expert to answer this question. HALLEX I-2-5-34.A.1.

A related issue concerns the specific treatment of epidural injections. The ALJ suggested that plaintiff should have kept getting these injections because they were effective. R. 33. The impression given by the ALJ is that plaintiff was needlessly shunning an easy and proven treatment. However, this conclusion fails to address several potential countervailing points. As an initial matter, plaintiff did willingly try this therapy, receiving numerous epidural injections from Dr. Rosche. *See* R. 255 (1/4/2010 visit, Dr. Rosche noting that plaintiff "does want future care and future interventional pain management consisting primarily of facet therapy and epidurals on a p.r.n. basis"). Therefore, this is not a case where a claimant was unwilling to try a therapy. Based on the current record, it is not clear why plaintiff stopped, and it may have been due to multiple reasons. In his opening brief, plaintiff's attorney stated that a "plausible alternate explanation for not seeking [further] injections is that [plaintiff] had previously received similar conservative treatment for ten years without success." Dkt. #12 at 12. This may be true, but the record is not clear on this point. As the ALJ noted, plaintiff himself indicated that these treatments were effective at least for a time. Another possible explanation, one given by plaintiff

---

this question, recognizing that it is a question that should be answered by a medical expert. *See generally* Carolyn A. Kubitschek and Jon C. Dubin, *Social Security Disability: Law and Procedure in Federal Court*, p. 495 (2016 Edition) ("Using a TENS unit, physical therapy, steroid injections, nerve blocks, undergoing diagnostic tests, including CT scans, nerve conduction studies, electromyography and MRIs constitutes *aggressive pain treatment*.") (emphasis added).

at the hearing, is that there were risks to continuing this type of treatment. *See* R. 81 ("Well, [Dr. Rosche] believed that we were coming to the point where I've had so many in the previous three years that it would start deteriorating the area and it would probably not be giving me – it would not be advantageous to continue to have more steroid shots or epidurals"). The ALJ and the Government do not address this testimony, apparently believing that there were no risks. But this assumption is, again, not obvious.[2] In sum, these epidural-related questions are another area where medical expert testimony is needed.

**Large Treatment Gaps.** The ALJ also believed that plaintiff had "large gaps in treatment suggesting relative stability." R. 34.This argument is also not well developed. As a factual matter, the ALJ's broad-brush claim about gaps is arguably unjustified by the record. The narrative portion of the opinion only refers explicitly to *one* gap. *See* R. 28 ("There is *a* large *gap* in treatment.") (emphasis added). This was a 13-month gap in treatment visits to Dr. Rosche— *i.e.* from April 30, 2008 to May 28, 2009. However, both before and after this period, plaintiff had numerous doctor visits and treatment. Moreover, even limiting the analysis to this one gap, it is unclear whether this gap was significant in light of the treatments being given. At the April visit, Dr. Rosche administered an epidural and prescribed multiple medications that plaintiff was presumably using throughout the period. R. 258. There is no indication in these records that plaintiff was supposed to see Dr. Rosche sooner. So, insofar as this Court can tell, this is not a situation in which a plaintiff missed scheduled appointments. Moreover, this one gap pre-dated the onset period and was years before the period in which plaintiff (according to the ALJ)

---

[2] *See* Mayo Clinic website, article entitled "Why are epidural steroid injections for back pain limited to only a few a year?" ("Epidural steroid injections are usually limited to just a few a year because there's a chance these drugs might weaken your spinal bones and nearby muscles. [] *The risk of side effects increases with the number of steroid injections you receive.*") (emphasis added).

reached "stability."[3] Again, intertwined within these factual questions are medical questions. Specifically, the assertion that plaintiff had multiple large treatment gaps carries with it underlying assumptions about the frequency and type of treatments that should be expected.

**Unremarkable Findings.** Perhaps the central rationale—the one the ALJ returned to repeatedly—is that the objective findings made by plaintiff's doctors were "generally unremarkable" with no "alarming" symptoms. More specifically, the ALJ focused heavily on the fact that, during a number of visits, plaintiff was found to have a normal gait, no muscle atrophy, and intact sensation. The following sentence from the opinion illustrates this general line of argument: "The claimant has presented with [a] range of motion restrictions both prior to after the alleged onset date, however, he has retained full strength and sensation in the upper and lower extremities, gait has been generally unimpeded, and straight leg raising is negative." R. 24.

The problem with this argument is that it is not backed by any medical testimony. The missing step in the analysis is whether the absence of these three particular symptoms means that plaintiff's pain allegations should be doubted. Insofar as this Court can tell, none of plaintiff's doctors (the people who made many of these observations) doubted plaintiff's pain allegations. To cite one example, although Dr. Rosche noted that plaintiff's gait was normal during the May 31, 2011 visit, despite this finding, Dr. Rosche proceeded to administer an epidural to plaintiff. R. 250. Perhaps the ALJ is correct in his belief that a person with work-disabling back pain would have a limp (among other things), but this conclusion is not supported by medical evidence in the record. A medical expert on remand must directly address this question. HALLEX I-2-5-34.A.1.

---

[3] Several times in the opinion, the ALJ emphasized that most of plaintiff's evidence pre-dated the onset date. R. 25, 33. However, in classic cherry-picking fashion, the ALJ relied on some of this same evidence when it supported the ALJ's rationales.

6

**Drug Seeking.** Another lurking rationale—one that plaintiff refers to as an "implication" in the opinion—is that plaintiff was a "narcotic seeker." Dkt. #12 at 12. As evidence for this assertion, plaintiff points to the following passage:

> Although he is on methadone, which counsel suggests is a medication meant for very severe pain, and the undersigned is not suggesting that the claimant does not experience severe pain, the record seems to indicate that the Claimant was transitioned from Norco to Methadone due to long term reliance and perhaps over reliance on narcotic pain medication. There are instances detailed in the narrative, which show that Claimant sought narcotics early or from multiple sources on more than one occasion.

R. 33. This passages refers to "instances detailed in the narrative," requiring this Court to sift back through the lengthy narrative. There is again a concern that this statement is an overly aggressive characterization of what the factual record supports. The ALJ referred in the plural to "instances," but plaintiff seems to believe it was mostly about *one* instance. In the earlier narrative portion of the opinion, the ALJ suggested that plaintiff may have been drug seeking when he visited two different doctors a few days apart in late March 2011, seeking medication for the same injury—in other words, he was double-dipping by doctor-shopping. R. 30 ("he was seeking additional pain medications . . . for the same injury"). The ALJ reached this conclusion by piecing together facts from two different exhibits. However, as plaintiff demonstrated in his opening brief, the ALJ misinterpreted these exhibits (specifically, the ALJ has confused the dates and times) to reach this conclusion. Plaintiff argues that this was not merely an inadvertent mistake, but was evidence that "the ALJ wanted to believe Claimant was a drug seeker and misread the evidence to support that belief" and further that this misreading "impacted the ALJ's view of the case and his assessment of Claimant's credibility." Dkt. #12 at 13. Although the Court cannot reach a firm conclusion about the ALJ's intent, it is undisputed is that the ALJ's analysis was based on a misreading of the factual record, itself a possible reason to remand. *See*

*Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not base a credibility determination on "errors of fact or logic").

Aside from this one "instance," there appears to be one other. The Government pointed to the following statement taken from Dr. Rosche's office notes on October 11, 2010: "[Plaintiff] has called in 4 or 5 times now for early Norco and we frown upon that here in the clinic and suggested that he supplant some of his Norco medication with methadone 10 mg b.i.d. and consider more interventional pain management." R. 252. This statement is ambiguous. The Government argues that it shows that Dr. Rosche was "concerned about [plaintiff's] long-term reliance on narcotic analgesics." Dkt. #15 at 12. But this argument shifts the debate from whether plaintiff was a drug seeker to whether he was too dependent on a particular pain drug. The latter assertion does not seem to be especially probative as to plaintiff's credibility, as it is possible that a person in severe pain would request more or different drugs. *See, e.g., Moore v. Colvin*, 743 F.3d 1116, 1123 (7th Cir. 2014). Neither Dr. Rosche nor any other doctor ever made an explicit statement that plaintiff was exaggerating or faking his pain; in fact, in the above statement, Dr. Rosche recommended "more" treatment. This is another issue where medical expertise could provide insight as to whether the implied accusation that plaintiff was drug-seeking was justified.[4] In sum, this Court cannot know how much this rationale may have played in the decision, as the ALJ used tentative language (*e.g.* the word "perhaps"). Still, given the trouble the ALJ took to dig out facts about drug seeking raises a question as to whether he was trying to shoehorn these facts into a preconceived narrative.

---

[4] The Court recognizes that it is not a simple question to answer in many cases. *See Kellems v. Astrue*, 382 Fed. Appx. 512, 515 (7th Cir. 2010) ("Several cases approve discounting the testimony of a claimant who has engaged in drug-seeking behavior, but none has defined what constitutes drug-seeking behavior.") (internal citations omitted).

## II. The Treating Physician Rule

Plaintiff's other major argument is that the ALJ failed to follow the treating physician rule in rejecting the opinions of Dr. Dorsey and Dr. Singh.[5] This argument echoes many of the themes from the first argument.

Once again, this Court will lay out the basics of the treating physician rule, which apparently goes completely ignored by the ALJs. Under the treating physician rule, a treating physician's opinion is entitled to controlling weight if it is supported by medical findings and consistent with other substantial evidence in the record. 20 C.F.R. §404.1527(c)(2); *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014). If the ALJ does not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it without further analysis. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Instead, the ALJ must determine what specific weight, if any, the opinion should be given. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). To make this determination, the ALJ must apply the checklist of six factors set forth in 20 C.F.R. §404.1527(c)(2). *Campbell*, 627 F.3d at 308 (referring to the factors as a "required checklist"). Failure to apply the checklist is reversible error. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (ALJ disregarded checklist). Here, the ALJ did not follow this two-step process, especially the second step.

As for the first step—whether these doctors' opinions were "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or were consistent with "other

---

[5] Dr. Dorsey wrote a one-page letter on March 29, 2012, noting that plaintiff had "a long history of back problems with multiple interventions and surgical procedures that have, unfortunately, not helped his back pain," that plaintiff would not be able to sit for more than 10 to 15 minutes without his back pain being aggravated, and that his ability "to do even minor day-to-day tasks at home is limited." R. 281. Dr. Singh, who started treating plaintiff in 2013, completed a 4-page questionnaire on November 27, 2013. He noted that plaintiff's prognosis was "life time – total remission plateaus at low probability." R. 399. He noted that plaintiff had a reduced range of motion, positive straight leg raising test, an abnormal gait, crepitus, swelling, muscle spasms, and impaired sleep. He opined that plaintiff could sit 20 to 30 minutes at a time, could stand 15 to 20 minutes at a time, would need daily unscheduled breaks, would be off task 25% of the day, and would miss more than four days a month. R. 400-402.

substantial evidence"—the ALJ arguably implicitly addressed these issues. 20 C.F.R. §404.1527(c)(2). However, the ALJ's analysis of the objective evidence is problematic because it relies on layperson assumptions about the larger inferences that should be drawn from the specific clinical findings. In particular, as to Dr. Dorsey, the ALJ stated the following:

> The associated physical examination revealed some tenderness and range of motion difficulties (Exhibit 3F), but no objective findings that are consistent with total disability, such as significantly diminished strength, an inability to walk or extreme neurological deficits. Dr. Dorsey's opinion is also inconsistent with the overall evidence of record. The undersigned recognizes that during the consultative examination, the claimant had a limp, positive straight leg raising and reduced sensation in the right leg, which is the opposite leg that the claimant [was] having radiating pain (Exhibit 4F). However, the bulk of physical examinations has yielded normal gait, no problems with upper or lower extremity strength, no evidence of muscle atrophy, negative straight leg raising, and preserved sensation throughout (Exhibit 1F, 3F, 9F, 10F).

R. 35.This passage rests on the assumption that plaintiff's pain allegations should be doubted if doctors found, during some visits, that plaintiff had a normal gait, no muscle atrophy, and preserved sensation. However, as noted above, this conclusion is not explained nor supported by an expert medical opinion. Further, as the ALJ recognized, the evidence was not uniform with regard to these particular symptoms. So, the precise issue is how much evidence is needed. The ALJ seems to be imposing a higher evidentiary threshold, as suggested by the assertion that a person experiencing this level of pain should have "*significantly* diminished strength" and "*extreme* neurological deficits." Putting aside the question of how the ALJ was defining "significant" and "extreme," the ALJ did not cite to any medical evidence or opinion to support these assertions.

The ALJ engaged in a similar approach in analyzing the Dr. Singh's opinion. The ALJ noted the following:

> Dr. Singh's statement is contradicted by Dr. Singh's own examination notes, noting stability on methadone, and a generally unremarkable physical examination, except

10

> for some reduced range of motion in the cervical and lumbar spine (Exhibit 10F). Dr. Singh's conclusion is also inconsistent with the other medical evidence of record described in detail throughout this decision, showing some findings of pain with movement, and restriction on movement, but no alarming clinical symptoms that would indicate that the claimant is so severely limited.

R. 35-36. Here again, the ALJ inserted qualifying words into the analysis—*e.g.* "*generally* unremarkable physical examination" and "no *alarming* clinical symptoms"—suggesting that the ALJ believed more severe clinical symptoms must be present to believe plaintiff's allegations. But these are medical judgments being rendered by the ALJ.

As for the ALJ's claim that these doctors' opinions were not consistent with the other evidence in the record, the ALJ used an unfair divide-and-conquer strategy in dismissing one-by-one the positive clinical findings from Dr. Dorsey, Dr. Singh, and Dr. Ramchandani (the consultative examiner). It raises a concern as to whether the ALJ first independently concluded that plaintiff had "generally unremarkable findings" and then used this global conclusion to then dismiss every contrary finding by calling it an outlier. *See* R. 36 ("Evidence of limping, reduced sensation and positive straight leg raising is considered the exception rather than the rule."). However, the ALJ gave little consideration to the fact that these three doctors were generally consistent with each other.

Turning to the second step, the ALJ did not analyze the six checklist factors. As for the first two—length and nature of treatment—the ALJ did not provide a straightforward explanation of the total number of visits nor the length of the treating relationship plaintiff had with Dr. Dorsey. The ALJ seems to have believed that the relationship with Dr. Dorsey was not close or extensive, although this conclusion is not clear. This interpretation receives support from the ALJ's statement, made in the narrative portion of the opinion, that "[t]here are records of only four encounters with primary care sources since the alleged onset date." R. 34. This seems to be

a reference to Dr. Dorsey, but it is not clear why the ALJ limited the tally to those visits after the onset date. There is also the following sentence taken from Dr. Dorsey's office notes on the same date as he wrote the opinion letter for plaintiff: "No past medical history on file." R. 282. The ALJ quoted this sentence in the narrative portion of the opinion, suggesting that Dr. Dorsey did not have any basis for his opinion. R. 31 (ALJ: "Dr. Dorsey noted that there was no past medical history on file."). But the ALJ did not refer to this sentence in the later paragraph analyzing Dr. Dorsey's opinion, and it would seem surprising that plaintiff's primary care physician had no records at all for plaintiff. In any event, putting these unresolved questions aside (which themselves are further reasons for a remand), there is evidence in the record suggesting that Dr. Dorsey, in fact, had a long-term relationship with plaintiff.[6] He not only saw plaintiff at least four (and likely more) times, but he also referred plaintiff to numerous specialists who, in turn, stated in their records that they were sending reports back to Dr. Dorsey. *See, e.g.,* R. 259. The ALJ gave no weight to this long-term relationship. If the ALJ believed it was not a close relationship, then he should develop the factual record and specifically ask plaintiff about this relationship at the hearing.

Even though the ALJ gave little deference to plaintiff's long-term treatment relationship with Dr. Dorsey, the ALJ used the shortness of plaintiff's treatment relationship with Dr. Singh to discount his opinion. The ALJ stated that Dr. Singh's notes "are comprised of a single encounter in July 2013, indicating that he was not the claimant's long time treating physician." R. 35. There is a question about how many visits plaintiff had with Dr. Singh. Plaintiff suggests in his reply brief that were at least two. *See* Dkt. # 20 at 3. The Court notes that the first question answered by Dr. Sign asked about frequency and length of contact, and he stated as follows: "4X annual—med monitoring 15/20 min." R. 399. There is, thus, a question about the specific

---

[6] Plaintiff states in his brief that the relationship goes back to 1995. Dkt. #12 at 9.

number of visits, but the larger concern is whether the ALJ selectively used this factor to discredit Dr. Singh's opinion, while ignoring it when considering Dr. Dorsey's opinion.

Another checklist factor not consistently analyzed is the fifth one—degree of specialization. This factor would seem to bolster Dr. Singh, who was a pain management specialist, presumably a relevant expertise for plaintiff's conditions. The Government does not dispute the latter point, but argues that the ALJ considered this fact because he mentioned it in the narrative portion of the opinion. But merely mentioning a fact leaves unanswered whether the ALJ gave any weight to it. A related issue is the ALJ's argument that plaintiff has not "consulted an orthopedic specialist or neurologist since the onset date." R. 34. This argument implies that these specialty areas were the more relevant ones. Even if this were true, this criticism overlooks that plaintiff initially saw at least one orthopedist (Dr. Sweet) who, after treating plaintiff, referred him to a pain management specialist. R. 27.

In sum, on remand, the ALJ should explicitly analyze the checklist factors. It is possible that this process will lead the ALJ to reach a different conclusion, but more importantly, it will at least force him to provide a more clear (and consistent) explanation.

\* \* \*

The Court has not addressed all of the reasons offered by the ALJ in the opinion, but the above concerns are sufficient to justify a remand. Therefore, rather than further analyzing any remaining arguments, the Court will leave these issues for the ALJ to address on remand after reviewing the record and calling a medical expert to testify at a new hearing. HALLEX I-2-5-34A.1.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: February 7, 2017     By: _____
                              Iain D. Johnston
                              United States Magistrate Judge